UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

FEDERAL TRADE COMMISSION,

     Plaintiff,

v.                                CASE NO. 8:14-cv-1155-T-23TGW

NPB ADVERTISING, INC., et al.

     Defendants.

_____/

## ORDER

The FTC sues (Doc. 22) Nicholas Congleton and others under Section 5 of the FTC Act for engaging in false or deceptive advertising.  The FTC alleges that Congleton published or caused the publication of (1) false or unsubstantiated efficacy claims, (2) false establishment claims, (3) deceptive testimonials, and (4) deceptive news websites.  The FTC moves (Doc. 46) for summary judgment and requests a permanent injunction against Congleton and restitution from both Congleton and "relief defendant" Dylan Loher.

## DISCUSSION

### 1.  Congleton enters the green-coffee extract business.

In April 2012, Nicholas Congleton received from a dietary-supplement manufacturer an e-mail touting the efficacy of "green-coffee extract" as a weight-loss aid.  (Doc. 52-1 at 63–64)  The e-mail linked to a three-minute clip from the

television show "Dr. Oz." (Doc. 52-1 at 64)  In the clip, Dr. Oz describes a clinical study — the Vinson study — that "showed women and men who took green-coffee extract lost an astounding amount of fat and weight, 17 pounds in 22 weeks by doing absolutely nothing extra . . . ." (Doc. 1-1 at 8)  After watching the Dr. Oz clip and searching the Internet to learn more about green-coffee extract, Congleton, with co-defendants Paul Pascual and Bryan Walsh, founded a green-coffee extract business. (Doc. 52-1 at 64)  The trade name of the defendants' product is "Pure Green Coffee."

To operate the business, Congleton, Pascual, and Walsh incorporated several corporations, including Nationwide Ventures, NPB, Olympus, JMD, Sermo, and Signature. (Doc. 46-5 at 1–9; 46-37 at 8)  Congleton, Pascual, and Walsh operated the Pure Green Coffee business primarily through Nationwide (*See* Doc. 52 at 7), but the corporations' functions overlapped.

Congleton bought several domain names, and in April or May of 2012 Pure Green Coffee began advertising on the Internet. (*See* Doc. 52-1 at 70–72)  Congleton supervised the advertising campaign. (Doc. 46-37 at 9)  Collectively the corporations paid Google and other digital-advertising companies $9,403,769 for online advertisements (Doc. 46-10 at 8), which generated $33,784,048 in gross receipts. (Doc. 46-5 at 7)  Congleton, Pascual, and Walsh deposited $30,220,088.26 into bank accounts belonging to the corporations. (Doc. 46-10 at 4)

In March 2013 Pascual received a civil investigative demand from the FTC and told Congleton about the demand.  (Doc. 52-1 at 128–29)  Nationwide continued to advertise the green-coffee extract (Doc. 52-1 at 129), and Congleton failed to change the content of the business's advertising.  (Doc. 52-1 at 131)  The defendants continued to sell Pure Green Coffee until 2014.  (*Cf.* Doc. 46-5 at 7, which notes that Nationwide reports gross income of $513,808 in 2014)

**2.  The FTC Act prohibits unfair or deceptive acts.**

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices . . . affecting commerce."  For each count, the FTC must show that Congleton misrepresented, expressly or impliedly, a material fact and that the misrepresentation likely would mislead a reasonable consumer.  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).  An express claim conveys a putative fact directly, while an implied claim conveys a putative fact obliquely.  *Kraft Inc. v. FTC*, 970 F.2d 311, 318 n.4 (7th Cir. 1992) (Flaum, J.).  An advertisement's "overall impression," not an isolated word or phrase, determines the representation conveyed.  *Removatron Intern. Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir. 1989) (Bownes, J.).

A representation is material if a reasonable prospective consumer likely would rely on the representation.  *FTC v. Washington Data Resources*, 856 F. Supp.2d 1247, 1272 (M.D. Fla. 2012) (citing *FTC v. Transnet Wireless Corp.*, 506 F. Supp.2d 1247, 1266 (S.D. Fla. 2007) (Marra, J.)).  Because an express claim inherently misleads a consumer, an express claim is presumptively material.  *Transnet Wireless Corp.*,

506 F. Supp.2d at 1267 (citing *Thompson Med. Co.*, 104 F.T.C. 648, 816 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) (Mikva, J.)).

## A.  The efficacy claims

A health-related efficacy claim, which states that the product yields the benefit promised, likely will mislead a reasonable consumer if the claim is false or if the advertiser lacks competent and reliable scientific evidence to substantiate the claim. *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp.2d 1167, 1189 (N.D. Ga. 2008) (Pannell, Jr., J.), *aff'd*, 356 Fed. Appx. 358 (11th Cir. 2009).  If the FTC alleges that a claim lacks competent and reliable substantiation, the defendant must produce the evidence on which he relied for substantiation.  *FTC v. QT, Inc.*, 448 F. Supp.2d 908, 959 (N.D. Ill. 2006) (Denlow, Mag.).  If the defendant produces evidence of substantiation, the FTC must prove the inadequacy of that evidence.  *See QT*, 448 F. Supp.2d at 959.

In this action, the FTC establishes that Nationwide claimed health-related efficacy.  The Pure Green Coffee advertisements promise consumers "[t]remendous weight-loss results":  seventeen pounds in twenty-two weeks, seventeen pounds in twelve weeks, sixteen percent of body-fat in twenty-two weeks, sixteen percent of body-fat in twelve weeks, twenty pounds in four weeks, twenty-eight pounds in nine weeks, or ten pounds and one-to-two inches of belly-fat in one month. (*See* Doc. 46-21 at 4; Doc. 46-37 at 28–32 for several examples of the Pure Green Coffee efficacy claims)

- 4 -

The FTC establishes the falsity of these efficacy claims.  Dr. David Levitsky, a professor of nutrition and psychology at Cornell University and an expert in weight loss, found the efficacy claims biologically implausible except for the claim that Pure Green Coffee would cause a consumer to lose seventeen pounds in twenty-two weeks (Doc. 46-12 at 14), the plausibility of which requires "close medical supervision and nutrient supplementation."  (Doc. 46-12 at 14–15)  By establishing the falsity of these express claims, the FTC shows that the claims likely would mislead a reasonable consumer.

Also, the FTC establishes that Nationwide lacks competent and reliable scientific evidence to substantiate the efficacy claims.  Opining that a scientist can accept a study's findings only if the study is "well-designed, well-executed, and well-analyzed," Dr. Levitsky explains that a competent and reliable study requires placebo control, double blinding, intent-to-treat analysis, drop-out tracking, human subjects with the same characteristics as the target audience, and the same ingredients and dose as the product making the efficacy claim.  (Doc. 46-12 at 8–10)  Even if the study's method appears sound, a scientist must consider whether a latent design flaw undermines the study's reliability.  (*See* Doc. 46-12 at 10)

Congleton admits that the efficacy claims lack a scientific basis.  (*E.g.*, Doc. 46-18 at 13 ("I don't know that there is a basis for [the claim of losing twenty pounds in four weeks]"); Doc. 46-18 at 16 (acknowledging no scientific basis for the claim that Pure Green Coffee cuts pounds of stomach fat every week); Doc. 46-37

at 28 (admitting no scientific basis for the claim that consumers can lose seventeen pounds in twelve weeks due to Pure Green Coffee); Doc. 46-37 at 28–30 (admitting that several efficacy claims lack a scientific basis)[1])  Because express claims that lack competent and reliable scientific substantiation likely would mislead a consumer, the FTC meets the burden of proof.

Even if Congleton had not conceded that the efficacy claims lack a scientific basis, the expert opinion of Dr. Levitsky establishes that no competent and reliable scientific evidence substantiates the claims.  In opposing summary judgment, Congleton cites news articles, blog entries, and manufacturers' brochures.  However, Dr. Levitsky concluded that none of these items constitutes reliable scientific evidence.  (Doc. 46-12 at 16)

Also, Congleton cites eight studies and one meta-study as evidence of substantiation, but Dr. Levitsky opined that none reliably substantiates the efficacy claims.  The Shimoda study, which examined animals, fails to state whether humans can receive the dose administered to the animals.  (Doc. 46-12 at 16)  The Henry-Vitrac study cannot reliably predict how green-coffee extract affects the human body because the study examined cells *in vitro*.  (Doc. 46-12 at 17)

Congleton relies primarily on the Vinson study, which tested the effects of green-coffee extract on sixteen people.  (Doc. 1-9)  The study separated the subjects

---

[1]  The FTC requested admissions under Rule 36, Federal Rules of Civil Procedure. Because Congleton failed to respond within thirty days to the request for admissions, under Rule 36(a)(3) the matter is admitted.

into three groups.  One group consumed a high dose of green-coffee extract for six

weeks, no green-coffee extract during a two-week "washout period," a low dose for

six weeks, no green-coffee extract during another two-week "washout period," and a

placebo for six weeks.  The other groups consumed a high dose, a low dose, and a

placebo in different sequences.

Dr. Levitsky concluded that five flaws undermine the reliability of the Vinson

study.  (Doc. 46-12 at 20–22)  First, the subjects lost more weight when consuming

no green-coffee extract than when consuming the product.  (Doc. 46-12 at 21)

Second, the greatest weight loss occurred "during the first washout period, in a group

that had not yet ingested any" green-coffee extract.  (Doc. 46-12 at 21)  Third, the

Vinson study failed to document the blinding process.  Fourth, the subjects received

three pills during the high-dose period but only two pills during the low-dose and

placebo periods, partially un-blinding the study.  (Doc. 46-12 at 21)  Fifth, Vinson

withdrew the study shortly after publication.  (Doc. 46-12 at 21)  Because the public

withdrawal of a study "usually results from an error in the calculation of the data or

misconduct on the part of the researchers," Dr. Levitsky inferred that Vinson lost

faith in the study's conclusion.  (Doc. 46-12 at 21)

Of the five other studies Congleton cites as evidence of substantiation,

Dr. Levitsky concluded that each study bore no relevance to Pure Green Coffee or

suffered from a methodological flaw that undermined the study's reliability.

(Doc. 46-12 at 22)  The Chatterjee abstract examined a product other than Pure

Green Coffee and contained too few details to verify the study's reliability. (Doc. 46-12 at 18)  The Farah study examined a subject other than weight loss. (Doc. 46-12 at 17)  The Thom study consisted of two studies.  (Doc. 46-12 at 19)  The first study failed to investigate weight loss.  (Doc. 46-12 at 19)  The second study investigated a product other than Pure Green Coffee, failed to report the drop-out rate, failed to document participants' caloric intake and exercise, and failed to describe the blinding and randomization processes.  (Doc. 46-12 at 19)  The Dellalibera study spanned too little time to prove the efficacy of green-coffee extract, failed to indicate a drop-out rate, and failed to use intent-to-treat analysis. (Doc. 46-12 at 17)  The Onakpoya meta-study, which concludes that "the effect of green-coffee extract on weight loss, if [any], [i]s minimal," fails to substantiate the efficacy claims.  (*See* Doc. 46-12 at 19–20)

Because Dr. Levitsky discredits the evidence produced by Congleton and because Congleton fails to rebut Dr. Levitsky's testimony, the FTC shows that no competent and reliable scientific evidence substantiates the efficacy claims, rendering those claims likely to mislead a reasonable consumer.  *See Nat'l Urological Group, Inc.*, 645 F. Supp.2d at 1186.  Because the efficacy claims are express, those claims are presumptively material.  *Transet Wireless Corp.*, 506 F. Supp.2d at 1267.

The FTC establishes that Congleton's material misrepresentations likely would mislead a reasonable consumer, and Congleton fails to offer rebuttal evidence to raise a dispute of fact.  The FTC is entitled to summary judgment on count one.

### B.  The establishment claims

While an efficacy claim states that the product yields a particular benefit, an establishment claim states that scientific proof supports the product's efficacy.  *See Thompson Med. Co., Inc. v. FTC*, 791 F.2d 189, 194 (D.C. Cir. 1986) (Mikva, J.) (distinguishing between an establishment and an efficacy claim).  An advertiser must support an establishment claim with evidence sufficient to satisfy a scientist of the claim's truth.  *In the Matter of Bristol-Myers Company, et al.*, 102 F.T.C. 21, 220 (1983) (Hyun, A.L.J.).

The Pure Green Coffee website and advertisements impart on a viewer the "overall impression" that scientific evidence establishes Pure Green Coffee's efficacy.  For example, a Pure Green Coffee website contains a picture of a man wearing a white doctor's coat and stethoscope and holding a pill, presumably a Pure Green Coffee pill.  (Doc. 3 at 12)  To the man's left, the website states, "Green Coffee Beans have been shown to inhibit fat absorption . . ." (Doc. 3 at 12), implying that a doctor or scientist proved the product's efficacy.  Even without the image of the doctor, the advertisements' mention of a "study" and of "proven results" leads a viewer to conclude that competent and reliable scientific evidence substantiates the efficacy claims.  *See Gillette Co. v. Norelco Consumer Prod. Co.*, 946 F. Supp 115, 121 (D. Mass. 1996) (Lindsay, J.) ("An establishment claim . . . says, in substance, that 'tests or studies prove' a certain fact.").

Other Pure Green Coffee advertisements and websites convey the same overall impression. The description of Pure Green Coffee on the Amazon product page devotes one-third of the total word count to the Vinson study:

> Scientific results in 2012.  The U.S. National Library of Medicine published a randomized, double blind, placebo-controlled study that evaluated the impact and safety of green coffee bean extract as a weight-loss supplement. Over 12 weeks, participants lost an average of 17 pounds by taking green coffee bean extract twice per day, making no other changes to their diet or exercise. On average, they lost 10% of their body weight and 16% of their total body fat.

(Doc. 46-22 at 6)  The mention of double-blinding, randomization, and placebo-control imparts to a viewer the overall impression that competent and reliable scientific evidence substantiates Pure Green Coffee's efficacy.

As explained above, Dr. Levitsky concludes that no competent and reliable scientific evidence substantiates the establishment claims, and Congleton fails to rebut Dr. Levitsky's expert opinion. The absence of competent and reliable scientific evidence to substantiate the advertisements renders the establishment claims likely to mislead a consumer. *Thompson Med.*, 791 F.2d at 194.  Because the establishment claims are express, the claims are presumptively material. *Transet Wireless Corp.*, 506 F. Supp.2d at 1267.

The FTC established that Nationwide misrepresented Pure Green Coffee's scientific support and that a reasonable consumer would likely rely on the misrepresentation.  The FTC is entitled to summary judgment on count two.

## C.  The testimonials

The omission of a material fact on which a reasonable consumer would rely in deciding whether to purchase the product renders an advertisement deceptive. *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988) (Ripple, J.) (citing *Katherine Gibbs School (Inc.) v. FTC*, 612 F.2d 658, 665 (2d. Cir. 1979) (Van Graafeiland, J.)).  In this action, the FTC alleges that Nationwide deceived consumers by failing to disclose that the testimonialists were compensated.

Chameleon Communications, a video-production company hired by Nationwide, paid four women to give testimonials praising Pure Green Coffee's efficacy.  (*See* Doc. 52-1 at 103 (Congleton: "I believe [the women] were compensated"))  Also, Nationwide gave the women a free sample of Pure Green Coffee.  (Doc. 52-1 at 103)  Nationwide's advertising failed to disclose that the women received money or a free sample in exchange for giving a testimonial. (Doc. 52-1 at 103–04)

The compensation of the testimonialists is material.  The Pure Green Coffee website prominently displays the testimonials beneath the words "Real People. Real Results."  (Doc. 22-7)  In the testimonials, the women state that other weight-loss products failed to cause weight loss but that Pure Green Coffee succeeded. (Doc. 22-7)  Because of the testimonials' prominent placement on the website and because the message targeted the skeptical prospective consumer, a reasonable consumer likely would rely on the testimonials in buying Pure Green Coffee.

The FTC shows that Nationwide's advertisements omit a material fact on which a reasonable prospective purchaser likely would rely, and Congleton fails to rebut the FTC's evidence.  The FTC is entitled to summary judgment on count three.

**D.  The news website**

Nationwide published dailyconsumeralert.org.  (Doc. 52-1 at 58)  The website, which contains a masthead for *Women's Health Journal*, a navigation banner with several health- or fitness-related categories, and the text "AS SEEN ON" next to the logos of CBS, ABC, MSNBC, and CNN (creating a false impression that these networks reported favorably on Pure Green Coffee), impresses a viewer as characteristic of a bona fide news outlet.  (Doc. 1-7 at 2; Doc. 46-37 at 33)  The presence of the word "Advertorial" in small font at the top of the page fails to alter the overall impression.  (Doc. 1-7 at 2)

An article about Pure Green Coffee, purportedly written by *Women's Health Journal* columnist Helen Hasman, occupies a majority of the website.  (Doc. 1-7 at 2)  The article, which offers a purportedly objective test of the product's efficacy, appears calculated to convince potential customers of Pure Green Coffee's efficacy.  (Doc. 1-7 at 2 ("[W]e here at Consumer Lifestyles were a little skeptical of this Green Coffee Bean Extract.  Even after pouring through mountains of research.  While I had an educated opinion, I still had no personal proof that the Green Coffee Bean was worth the time. . . ."))  A reasonable prospective consumer likely would rely on the website.

- 12 -

Congleton admits that he and a co-defendant copied the Hasman article from another website, that Congleton lacks knowledge of whether Hasman exists, and that Hasman consumed no Pure Green Coffee.  (Doc. 46-37 at 33)  Because the fake news website likely would mislead a reasonable consumer, the FTC is entitled to summary judgment on count four.

**3. Congleton is individually liable for the corporate defendants' false advertising.**

To hold Congleton individually liable for the corporate defendants' deceptive acts, the FTC must first establish that the corporations operated as a "common enterprise."  If the structure, organization, and pattern of a business venture reveal a "maze" of integrated corporate entities, the FTC disregards corporateness. *Washington Data Resources*, 856 F. Supp.2d at 1247.  A common enterprise operates if the corporations maintain officers and employees in common, operate under common control, commingle funds, and share advertising and marketing. *Washington Data Resources*, 856 F. Supp.2d at 1247 (citing *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746 (2d. Cir. 1964) (per curiam); *FTC v. Neovi, Inc.*, 598 F. Supp.2d 1104, 1116 (S.D. Cal. 2008) (Sammartino, J.)).

Nationwide and the other corporations operated as a common enterprise.  The corporations operated under common control (*See, e.g.*, Doc. 46-37 at 8–9), commingled funds (*See, e.g.*, 46-27 at 36–37, 40–42; 46-29 at 22–24), shared advertising  (*See* Doc. 46-37 at 8), and retained the same employees, including

- 13 -

bookkeeper Maritza Ruiz (Doc. 46-29 at 25–27) and web developer Brandon
Congleton (Doc. 46-30 at 49, 154–56).

Also, the FTC must prove that Congleton knew of the enterprise's deceptive act
and participated directly in, or had authority to control, the act. *See FTC v. Gem
Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996).  A defendant knows of a deceptive
act if he knows of a material misrepresentation or if he manifests reckless indifference
to the falsity of the misrepresentation.  *See FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564,
574 (7th Cir. 1989) (Harlington Wood, Jr., J.).  The FTC need not prove that
Congleton intended to defraud a consumer.  *Amy Travel Serv.*, 875 F.2d at 574.

The FTC establishes that Congleton knew of the material misrepresentations.
Congleton admits that he knew the efficacy claims lacked a scientific basis. (*See, e.g.*,
Doc. 46-18 at 13 ("I don't know that there is a basis for [the claim of losing twenty
pounds in four weeks"); Doc. 46-18 at 16 (acknowledging no scientific basis for the
claim that green-coffee extract cuts pounds of stomach fat every week); Doc. 46-37
at 28 (admitting no scientific basis for the claim that consumers can lose seventeen
pounds in twelve weeks due to green-coffee extract)).

At the minimum, Congleton's conduct evinces a reckless indifference to the
truth or falsity of the claims.  Congleton based the efficacy claims on the Vinson
study and on a Dr. Oz. segment.  (Doc. 52-1 at 137–38)  Asked how the Vinson study
informed his understanding of green-coffee extract's efficacy, Congleton stated, "I
mean, these are medical doctors. I'm not a medical doctor. I don't know exactly that

- 14 -

I understood everything that's being said in here." (Doc. 52-1 at 138)  Congleton also deferred blindly to Dr. Oz's "expertise." (Doc. 52-1 at 138 ("[Dr. Oz] claims to be a doctor, so I went off his word as well."))  Also, Congleton admits to copying unverified claims from competitors' ads or websites. (*E.g.* Doc. 52-1 at 58, 85, 107, 110, 115).

Congleton raises a "good faith" defense.[2] (*See, e.g.*, Doc. 52 at 7 ("Congleton relied on and trusted Dr. Oz's statements"); ("[Congleton] reviewed and studied the same medical reports and studies relied on by Dr. Oz."))  However, Congleton's copying of unverified content from other websites and Congleton's reliance both on a Dr. Oz segment and on a clinical study that Congleton failed to comprehend evince Congleton's reckless indifference to the falsity of the claims. Whether by knowing of a material misrepresentation or by manifesting reckless indifference to the falsity of a misrepresentation, Congleton actually or by imputation knew of a deceptive act.

By establishing and overseeing Pure Green Coffee's marketing campaign, Congleton participated directly in the deceptive advertising practices. (Doc. 46-37; Doc. 52-1)  Also, Congleton admittedly controlled the Pure Green Coffee business by managing the business's advertising (*See, e.g.*, Doc. 46-37 at 12, 20, 21) and websites (Doc. 46-37 at 17), deciding business matters on behalf of the corporations (Doc.

---

[2] Also, Congleton's opposition to summary judgment raises a good-faith defense based on reliance on counsel (Doc. 52 at 7), but Congleton withdrew that defense. (*See* Doc. 10 (agreeing to withdraw the reliance-of-counsel defense; Doc. 16; Doc. 52-1 at 78)) Relying on Congleton's voluntary withdrawal of the defense, the FTC declined to depose Congleton's counsel. (Doc. 56-1 at 3) Congleton would unduly prejudice the FTC by reintroducing the defense more than two years after waiving it.

46-37 at 9), signing contracts on behalf of Nationwide (Doc. 46-37 at 11), accessing the corporations' bank accounts (Doc. 46-37 at 13), and hiring and firing Pure Green Coffee employees (Doc. 46-37 at 37). Because Congleton knew of and controlled the corporate defendants' false advertising, Congleton is individually liable.

**4. The First Amendment offers Congleton no protection for a knowingly false statement calculated to effect a fraud.**

Citing *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976), Congleton claims that the application of the FTC Act to the "opinions" expressed in Nationwide's advertisements violates the First Amendment. (Doc. 52 at 22–23) An advertiser may lawfully engage in "puffery," i.e., state an opinion about a product, *Nat'l Urological Group, Inc.* at 1205–06 (citing *Sterling Drug, Inc. v. FTC*, 741 F.2d 1146, 1150 (9th Cir. 1984) (Hug, J.) ("Puffing . . . claims are either vague or highly subjective.")), but an advertiser's publication of a knowingly false statement of fact subjects the speaker to civil liability. *Virginia State Bd. of Pharmacy*, 425 U.S. at 771 (noting that untruthful commercial speech "has never been protected for its own sake"). If a statement is falsifiable, the statement is of fact, not opinion. *See United States v. Simon*, 839 F.2d 1461, 1468 (11th Cir. 1988) (finding that a defendant committed fraud by "placing otherwise general assertions . . . into a concrete, factual setting"); *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv.*, 911 F.2d 242, 246 (9th Cir. 1990) (per curiam) (noting that an advertiser's quantification of an otherwise-vague claim exposes the advertiser to liability for fraud).

The statements of fact for which the FTC sues Congleton convey specific (rather than vague), objective (rather than subjective) representations about the efficacy of Pure Green Coffee.  (*See* Doc. 46-37 at 28–32 for examples of Pure Green Coffee claims)  The claims purportedly quantify the efficacy of Pure Green Coffee and therefore expose the claims to falsification.  Applying "the widely accepted mathematical model" for predicting weight loss, Dr. Levitsky falsified those claims.  Because Congleton knowingly misrepresented Pure Green Coffee's efficacy, the First Amendment offers Congleton no protection from civil liability.  *See Virginia State Bd. of Pharmacy*, 425 U.S. at 771.

**5. The FTC need not present evidence that Congleton misled a consumer.**

Citing *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 43 (D.C. Cir. 1985) (Bork, J.), Congleton argues that the FTC must prove that consumers were misled.  (Doc. 52 at 14–17)  Congleton's argument misstates the FTC's burden of proof.  The FTC must show that Congleton's representations likely would mislead a reasonable consumer.  *Tashman*, 318 F.3d at 1277.  As noted above, the FTC meets that burden.

No precedent cited by Congleton requires the FTC to show in an action involving express claims that consumers were misled.  Distinguishing between an express and an implied claim, *Brown & Williamson Tobacco* explains that the FTC should introduce "empirical evidence of consumer perception" for only an implied claim, i.e., a claim in which "the language of the advertisement is ambiguous and the

- 17 -

deception not, therefore, facially apparent."[3]  778 F.2d at 40; *accord 3M Innovative Prop. Co. v. Dupont Dow Elastomers LLC*, 361 F. Supp.2d 958, 969 (D. Minn. 2005) (Davis, J.) (explaining the burden of proof for an implied claim); *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 323 (6th Cir. 2001) (Boggs, J.) (explaining the burden of proof for an implied claim); *BellSouth Advert. & Pub. Corp. v. Lambert Pub.*, 45 F. Supp.2d 1316, 1323–24 (S.D. Ala. 1999) (Butler, J.) (explaining the burden of proof for an implied claim).  Because Nationwide's claims were both express and facially false, the FTC need not introduce a consumer affidavit or market study.

Also, Congleton challenges the constitutionality of the FTC's presumption of materiality for express claims.  (Doc. 52 at 16)  Specifically, Congleton argues that the First Amendment requires the FTC to prove that Congleton's advertisements misled a consumer.[4]  As explained above, the First Amendment offers Congleton no protection from civil liability for knowingly false speech calculated to effect a fraud. *United States v. Alvarez*, 132 S. Ct. 2537, 2547 (2012) (citing *Virginia Bd. of Pharmacy*, 425 U.S. at 771).

---

[3]  *Brown & Williamson Tobacco* holds that, even for an implied claim, the FTC need not introduce consumer survey data to show an advertisement's tendency to deceive. 778 F.2d at 41.

[4]  Also, Congleton claims that the Dietary Supplement Health And Education Act, 21 U.S.C. §§ 301 et seq., precludes the granting of summary judgment. That act, which broadens the Federal Food, Drug, and Cosmetic Act to include some dietary supplements, imposes no duty on the FTC in this false advertising action.

**6. Congleton waived the res judicata argument.**

Citing a 2014 settlement between the FTC and Applied Food Sciences (the manufacturer from whom Pure Green Coffee bought the green-coffee extract), Congleton asserts — for the first time — that res judicata "may" bar the FTC's claims.  (Doc. 52 at 17)

Rule 8(c) requires a defendant to raise res judicata in the answer.  Congleton's failure to raise res judicata in the answer waives the defense. *See Funding Sys. Leasing Corp. v. Pugh*, 530 F.2d 91, 96 (5th Cir. 1976) ("When the defendant has waived his affirmative defense by failing to allege it in his answer. . . he cannot revive the defense. . . [on] summary judgment.").

A defendant may assert a defense initially waived if later events establish the defense and if assertion of the defense will not prejudice the plaintiff, but the defendant must assert the defense promptly.  *Nat'l Urological Grp.*, 646 F. Supp.2d at 1187 (citing *In re Air Disaster at Brunswick, Georgia*, 879 F. Supp. 1196, 1200 (N.D. Ga. 1994) (O'Kelley, J.)).  In this action, the FTC notified Congleton of the Applied Food Sciences settlement in September 2014.  (Doc. 74-1 at 2)  Sixteen months after learning of the settlement, Congleton raised res judicata for the first time.  Having failed to timely raise res judicata after learning of the settlement, Congleton cannot defeat summary judgment by raising the defense.

**7. A permanent injunction against Congleton is warranted.**

A permanent injunction under Section 13(b) of the FTC Act is warranted if the FTC demonstrates a cognizable danger that the defendant will violate the law again. *United States v. T. Grant Co.*, 345 U.S. 629, 633 (1953). The continuing or prospective presence of a cognizable danger depends on the nature of the past violation, the harm that might result from a future violation, and whether the defendant's occupation or knowledge positions him to violate the law again. *See Nat'l Urological Group*, 645 F. Supp.2d at 1209 (citing *FTC v. Citigroup, Inc.*, 239 F. Supp.2d 1302, 1306 (N.D. Ga. 2001) (Smith, J.)).

Because Congleton conducted a deceptive advertising campaign for years, because Congleton knew of the advertisements' falsity, because Congleton failed to immediately discontinue the deceptive advertising after learning of the FTC's demand (Doc. 52-1 at 128–32), because another violation could seriously harm a consumer (*Nat'l Urological Grp.*, 645 F. Supp.2d at 1210 (discussing the potential harms of unsubstantiated dietary-supplement advertising)), because Congleton appears proficient in internet-advertising techniques (*See generally* Doc. 52-1; Doc. 46-37), and because the barriers to entry in the dietary-supplement industry are low, the FTC proves a cognizable danger of a prospective violation. A permanent injunction that bars Congleton from conducting the same variety of deceptive advertising he undertook at Pure Green Coffee is warranted.

**8. Congleton must disgorge $29,131,512.**

The FTC's proposed order (Doc. 46-1) seeks disgorgement of $29,131,512, which the FTC calculated by subtracting from the defendants' $30 million in gross receipts (*See* Doc. 46-10 at 4; 46-5 at 7) customer refunds and disgorgements by other defendants. The proposed disgorgement is reasonable and appropriate.

Congleton argues that profit, rather than net revenue, is the proper measure of disgorgement. However, *FTC v. Washington Data Resources, Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013), holds that net revenue, rather than profit, appropriately measures a defendant's unjust gain under section 13(b).

**9. Dylan Loher must disgorge title to the Twelfth Street property.**

With $549,000 from a Pure Green Coffee bank account, Congleton bought a warehouse on Twelfth Street in Tampa for use as a Pure Green Coffee headquarters. (Doc. 46-27 at 26; Doc. 46-28 at 6 ("[N]one of [Loher's] money went into . . . purchasing the warehouse.")) Congleton asked his brother Dylan Loher to sign the deed (Doc. 46-28 at 5), although Loher performed no work for Congleton or Pure Green Coffee. (Doc. 46-28 at 7–8) Loher signed the deed and holds title to the property.

Suing Loher as a "relief defendant," the FTC seeks disgorgement of $550,000 as an "ill-gotten gain" flowing from Congleton's deceptive advertising scheme. (Doc. 46 at 39) Equity permits the remedy of disgorgement if the defendant cannot show a legitimate claim to "ill-gotten" proceeds. *FTC v. Think Achievement Corp.*,

144 F. Supp.2d 1013, 1020 (N.D. Ind. 2000) (Springmann, Mag.) (citing *SEC v. Cherif*, 933 F.2d 403, 414 & n.11 (7th Cir. 1991) (Cummings, J.); *SEC v. Egan*, 856 F. Supp. 401, 402 (N.D. Ill. 1993) (Shadur, J.); *SEC v. Cross Fin. Serv., Inc.*, 908 F. Supp. 718, 730–32 (C.D. Cal. 1995) (Paez, J.)).

Loher fails to oppose the FTC's request for disgorgement. Because Loher purchased the property with proceeds from the Pure Green Coffee business and because Loher admits that Loher performed no work for Pure Green Coffee that entitled Loher to $549,000 (Doc. 46-28 at 6–8), Loher must disgorge title of the Twelfth Street property to a liquidator.

## CONCLUSION

The Pure Green Coffee business conveyed to the public false or unsubstantiated efficacy claims, false establishment claims, deceptive testimonials, and deceptive news websites. Because Congleton knew of and controlled the corporations' false advertising, Congleton is individually liable. The FTC's motion (Doc. 46) for summary judgment is **GRANTED**. The clerk is directed (1) to enter a judgment for the FTC and against Nicholas Scott Congleton in counts I, II, III, and IV of the amended complaint, (2) to enter a judgment in the amount of $549,000 for the FTC and against Dylan Loher, and (3) to close the case.

ORDERED in Tampa, Florida, on November 2, 2016.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE